Please proceed, Counselor. Thank you, Your Honor. Good morning, Your Honors. I'm Kenneth Covell. I represent Mr. Gregg Conitz. He's present in the courtroom here, and I have the privilege to have with me my son Nick and daughter Julia this morning as well. Morning, Counsel. Is Nick a lawyer in training? He's a high school graduate at this point. He's off to college in the fall. Early training. Yeah, yeah. I'd like to welcome you to Alaska and thank you. And you hope if you don't win, you at least don't embarrass yourself when you've got your family out there. That's absolutely true. That's a risk. I don't know if we also have the internet feed. I did a case once and they had that, so there may be other people listening as well. So we'd like to welcome you to Alaska and thank you for coming up here. And we brought great weather with us. Absolutely. And we'd invite you next year to come all the way to Fairbanks. Since we have ten minutes here, I'm going to try to keep my remarks brief. We may be more interested in what the court's got to say than the court perhaps is interested in what we have to say. To start out, and trying to digest things down, the case here is about the statement, quote, first preference on all mine jobs go to NANA shareholders. That's what we're here about. That's why Mr. Conant is here. Now that's if the two candidates, if there were two, were equally qualified, both qualified for the job, the preference would go to the shareholders of the corporation. Isn't that right? Well, if you believe what the defendant says at the very instant, that that's their policy. Because we also have printed materials from the defendant and the 1982 agreement that say, and the printed materials are recent, they're from NANA, they have the corporate seal of NANA and the corporate seal of tech on them, and they have statements in there to that effect. And that's an excellent question. I'm glad you asked it because it hopefully, well, here's my analysis of the case in a sentence. Racial job preferences, I'm sorry, I lost my place. Shareholder job preferences are racial discrimination when immutable characteristics determine who can be a shareholder. But that's not so, is it? You can, as someone that is not a native Alaskan, if we're not calling that, could inherit these shares and become a shareholder. They wouldn't be native Alaskan. Wouldn't have to be. Well, they wouldn't have to be. Likely they are, and also likely they are native Alaskan culturally because they know somebody closely, live in a village, marry them, what have you, are adopted. But that's not an immutable characteristic, though. No. Could a white person get shares in NANA? Yes. Do we have demonstration of that? I don't think we have demonstration of that on this record. What they've told us is there's 65 people out of 11-some thousand that are not one-quarter blood quantum. Well, that's part of the problem is that there wasn't much development of the factual record. I think that the strategy was to have this case decided on a legal principle, so the facts were not fleshed out, and that's probably to your detriment. Well, I'm sorry to hear that. Let me try to gather my thoughts here. That's a token black-at-the-country club defense, I'd suggest, to your honor. If you flip the coin around and say, I own the store in Kotzebue, and I am not going to hire NANA shareholders, I think that you would have a hue and cry saying this is racial discrimination. Ninety-nine and a half percent of this population is Alaskan native. So could I do that? Could I go out and do that and say, I'm not hiring shareholders? And I think not, your honor. I think that the fit, and this is the argument from Rice v. Cayetano as well, where they said, well, some of these people might have come from the Marquesas and other things at the time of Captain Cook, and therefore they're not ethnically or racially, and I'm sorry, I don't know the group name, but whatever the specific native Hawaiian is. And in Rice v. Cayetano, they say, we reject this argument. This can be a proxy for race, and it is here. And I don't see any difference from that here, your honor. And in the Malabat case as well, they used a similar type of scheme, and that scheme was rejected there as well. Mind you, I don't think they had the half a percent issue there. Do you think the McDonnell-Douglas factors apply in this case? Your honor, I'm perplexed by that. I think that, first of all, the McDonnell-Douglas tax was created, and I cite it to say is created to make plaintiff's cases easier and not a barrier to pursuing them. I look at this, and sometimes I tell myself, yes, but I cite it to the court, and I apologize it being at the last minute, but the New Haven Firefighter's case in a letter on Thursday, and in that matter, and that only came out a month ago, and I just got to read it Wednesday, but in that matter, they said that, or they didn't mention McDonnell-Douglas at all. They just said there's a testing procedure, you change the testing procedure, this is direct discrimination. Okay, this is not a testing case. Well, you know, I didn't brief it that way, and I didn't think of it that way until I read that case, because arguably it is a testing case, because the scheme that was set up by the employer was we're going to put these four guys in this job, we're going to see who's the most qualified, then we're going to let Mr. Kells pick the best qualified. A testing case is where you have an objective, theoretically objective measurement that you use to determine who's qualified. I don't think we have that here. Well, if I might respond, in Hartford, the firefighters had a practical examination, as it were. They were interviewed by three chief-like figures to say, what would you do in this situation? And that was 40% of the grade or something. In this instance, you have Mr. Konitz and the other applicants doing the actual work, and I assume talking to their supervisor about how they did on the job. Well, in the Hartford case, there was no issue about whether the test was discriminatory. The issue was that how the people were selected from the list, because the minority candidates were not high up enough on the list, the list was frozen. So that's a pretty different scenario than we have here. I haven't had an opportunity to develop it. I think I could. I thought it was relevant, and I stated it. Okay, if we disagree with you, and we think that the proper way to analyze this case is under McDonnell Douglas, how would you fit your case into the prongs of McDonnell Douglas? Well, Mr. Konitz has to show that he applied for the job. He was qualified. He was qualified, and he was rejected for a candidate from another group. Okay. The question I have is, what in the record shows that he was qualified for the job? Well, this is the problem, Your Honor. Mr. Kels' testimony is the best evidence of that. All right? And the status of the case was that Judge Beisle said, Judge, I need to do more discovery to answer the facts on their summary judgment motion, because I wanted him to do the motion for order to rule the law. I didn't file summary judgment. And he said, No, we're going to decide the legal issue here. And then he said, If you lose, Mr. Covell, it's all over. If you win, Mr. Covell, we'll come back here and do more work. So I wasn't given a fair due process opportunity to meet that. The best authority on that I have is another tech case, which is Mitchell v. Techcomico cited in the briefs, a state case where a similar thing happened. To sort of come back to the pure legal issue, I think I'm running out of time here in a hurry. In the yellow brief, in the reply brief, I may not have made myself clear. What I was trying to say there is there's also here arguably a claim for a hostile work environment. And that means merely having a policy, whether we believe exactly what they say, it only applies when both candidates are equal. It's like walking in the lunchroom at work, sitting down, and there's a sign on the wall that says, We prefer blacks to whites or whites to blacks. Does that create a hostile work environment? Certainly under the state statute, the 1880-200-A3, whatever it is, the A3, I'd suggest to you that it does. And I'd suggest to you that you can easily analytically reach the question of whether any shareholder preference in the work environment is legal or not. And if you reach that analytically, whether or not you consider that an issue in the case, then you've got to answer that, assuming you get over the 99.5% issue, you've got to answer that affirmatively that that is discrimination. Then you can come back to how we briefed the case initially. All right, Counsel, you've exceeded your time. We'll give you one minute for a rebuttal. All right, thank you very much. Good morning. I'm Sean Halloran for Tech Alaska. And Nan has asked that they be given three minutes of time. If you save it for him. All right. I just want to respond to a couple of points that Mr. Cavell just made. First of all, with respect to the case that he cited on Friday, Ricci v. DeStefano, I think it's highly inappropriate that he would cite that as authority the way he did because he wasn't saying that you need to apply the legal holding of that and that it fits with any argument that he's previously made. What he did was he submitted a brand-new argument to the court saying that in the past, although he's only ever briefed and only ever argued to the district court below, that this was a disparate impact case that he now says, gee, if I'd paid attention and looked at the facts of that case, they articulated a disparate treatment case. And he wants to now say that this is a disparate treatment case. And that's not the case, and the facts are very different here. There was not some test that was adopted by Tech in order for people to be promoted. And not all the candidates were given a position as an acting supervisor. I mean, one of them was not an employee of the company when he was a candidate. They certainly didn't have an opportunity to put him in as an acting supervisor. But it has no basis that he's saying that there's some sort of test that was later abandoned in order to have some sort of determination based upon one's race. Counsel, what's your response to opposing counsel's representation that he was not given adequate time to flesh out the facts in this case? Every motion that he made to the court for additional time was granted. And he made several motions for additional time. He was given opportunities to conduct discovery. We offered to make people available for depositions. And every time he was offered someone for a deposition, he chose not to take advantage of that time and insisted that he would not be taking depositions until after the time that the court had set as a deadline to respond to summary judgment had passed. He just wasn't willing to depose the people that he now says the district court didn't allow him time to depose. I mean, he said he was going to take depositions in April. He then went on vacation in April. Counsel was on vacation. And, you know, we offered to make people available during the time periods when he said to the court that he needed time to take depositions. If they didn't develop a factual record, if they think there were facts out there that didn't get in, it's only the plaintiff's fault in this case, and it is not a problem with the court. Did you want to address your cost appeal on the attorney's case? I'm happy to answer any questions that you have. Otherwise, I'd be happy to submit it on the briefs. And I think it's pretty well addressed in there. Do you have any questions about the attorney's case? All right. Otherwise, I think I'll just turn the case over to Nana at this point. All right. Thank you, counsel. May it please the court, my name is Tom Daniel, and I represent Nana Regional Corporation, the owner of the land where the Red Dog Mine sits. And I just want to make a couple of very brief points about the shareholder preference. Assuming the court finds it necessary to reach that issue, which I don't think is necessary. And you think it's not necessary because there was no showing that Mr. Konitz was qualified for the position? Correct. Suppose we were to agree with you on that point, what else do we have to decide in the case? I don't think you have to decide anything else in the case. Okay. You can affirm the district court on that basis. But we still have the issues of attorney's fees. We still have the issues of attorney's fees, that's correct, on the cross appeal. But if you were to decide that issue adverse to the defendants or not reach it, on the shareholder preference issue, I just want to make two points. One is, I think there's confusion here because the plaintiff keeps arguing that shareholder equals native. It's a racial group. And I want to make it clear that under the Alaska Native Claims Settlement Act, that's simply not true. On the one hand, you have the racial group of Alaska natives. And on the other hand over here, you have the group of owners of native corporations, the shareholders. And the two are not synonymous. And the reason for that is that the original shareholders of Alaska native corporations were natives in 1971. So that means that there are Alaska natives over here who weren't born in 1971, who were born after then, who own no shares in a native corporation. In addition, there are shareholders of native corporations who have acquired their shares by gift or inheritance who are not racially classified as Alaska native. So you have some shareholders, including some shareholders of NANA, which the record shows, who are not of the racial group of Alaska native. And you have some Alaska natives who are not shareholders of any native corporation. So treating the two groups as identical just doesn't hold water. So what that means is the only theory on which the plaintiff can pursue a discrimination claim is the disparate treatment claim, is a claim that whites are disadvantaged because of a neutral practice of giving preference to shareholders. But as we pointed out in the brief, that theory doesn't fly. There's not a single case that we've been able to find or that the plaintiff has cited that that theory has ever been applied to a historically advantaged group, in this case white males. And in the one case that we did find, the court rejected it for that very reason because the shareholder preference policy here does not perpetuate any historical discrimination, which is what the disparate theory was aimed at prohibiting. Unless you have questions, that's all I have. Thank you, counsel. Thank you. One minute for rebuttal. Thank you, Your Honor. First of all, in response to Mr. Daniel, Mr. Konitz is a minority in the northwest Arctic borough, 90 percent Alaska native, and that's the situation. So you have sort of everything flipped on its head here. And there's no history of discrimination at the mine. Mr. Kelz's statement has been acknowledged by the defendant in their pleadings, and they've complained. Well, okay. As far as what the judge said, if you look at the transcript of the May 15th hearing, which is cited multiple times, I couldn't find the best site for it, but my blue brief at page 18 is one site to what the judge says. He says, you know, I was thinking of that midway. I got the broad summary judgment motion, which is their motion at 94, and was in context of reviewing that that I realized the whole case really is going to boil down to a legal issue. And the legal issue is the one that Mr. Covell did, in fact, present in his motion at docket 64, which is the motion for order of rule of law. And then the judge, and again, it's cited a bunch of times, but the judge essentially says, brief the legal issue. I asked for more time at that hearing. Mr. Halloran was going to be in a big trial for five months or something and unavailable. Then he said the case settled. We can do discovery. And the judge says, and again, it's cited in the brief, we don't need to do that. We're going to brief the legal issue. If I thought I was supposed to be doing the facts, I would have filed the Kelz affidavit. I had it for the deposition. I had it. I didn't want to do an incomplete job and just use half of my information because then arguably I'd be told I waived it as to the other things I had. Well, the Kelz deposition really didn't help you all that much because it didn't address the specific position of supervisor. I mean, Mr. Kelz was complimentary regarding the overall ability of your client but didn't specifically say that he was qualified for the supervisor position or best qualified. Mr. Kelz, and I beg to differ with Your Honor, but it's in the record. Mr. Kelz said he was told to try out these three or four individuals, pick the best one, and it would be his pick. He went to Mr. Zagarlik and said, I pick Mr. Konitz. Mr. Zagarlik said, okay, fine, I'll go tell Ted or whatever the name of the next man up the line was. Then Mr. Kelz and Mr. Scott and Mr. Zagarlik, the other two, Zagarlik and Scott, if I'm getting the name right, were up the food chain from him, had a meeting with him, and told him that they had to pick the NANA shareholder and or Native Alaskan, I forget which words they used, instead of Mr. Konitz. Okay. So, okay.  Thank you. Thank you, Your Honor. Thank you to both counselors. The case just argued is submitted for decision by the court.
judges: Farris, Thompson, Rawlinson